**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| STEPAN BRUGER and DMYTRO BRUGER, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Case No. 19 C 2277 |
| | ) |
| OLERO, INC., EMB GROUP, INC., | ) Judge Joan H. Lefkow |
| OLEG ROMANYUK, and | ) |
| EUGENY MINOCHKIN, | ) |
| | ) |
| Defendants. | ) |

## OPINION AND ORDER

Defendants EMB Group, Inc. (EMB) and Eugeny Minochkin have moved for summary judgment under Federal Rule of Civil Procedure 56 (dkt. 258) and for sanctions under both 28 U.S.C. § 1927 (dkt. 269) and Federal Rule of Civil Procedure 11 (dkt. 278). For the following reasons, the motions for sanctions are denied, and the motion for summary judgment is granted in part and denied in part. Summary judgment is granted with respect to plaintiffs' civil conspiracy and unjust enrichment claims. Regarding plaintiffs' Illinois Wage Payment and Collection Act claim, summary judgment is granted with respect to plaintiff Stepan Bruger (Stepan) and denied with respect to plaintiff Dmytro Bruger (Dmytro).

## MOTIONS TO STRIKE

In their reply (dkt. 307) to plaintiffs' statement of facts (dkt. 299-1), defendants move to strike the entirety of plaintiffs' statement of facts, as well as several affidavits and declarations (dkts. 300-2; 300-3; 300-4) plaintiffs attached as exhibits to their response to defendants' motion for summary judgment. Specifically, in addition to plaintiffs' Rule 56.1 statement of facts (dkt.

299-1), defendants move to strike the declarations of Stepan (dkt. 300-2), Dmytro (dkt. 300-3), and witness Sergey Karichev (dkt. 300-4). Because the resolution of these motions to strike may affect the analysis of defendants' motion for summary judgment, the court first addresses these motions before proceeding to the question of summary judgment.

## I.     *Stepan & Dmytro's Declarations*

Defendants argue that Stepan's sworn declaration (dkt. 300-2) should be stricken in its entirety because, they say, some paragraphs of the declaration contradict Stepan's deposition testimony. (Dkt. 307 at 4). Specifically, defendants contend that Stepan contradicts himself when he asserts that he had conversations with Minochkin (dkt. 300-2 ¶ 28) and that defendant Oleg Romanyuk (Romanyuk) told Stepan at his interview that he would be working for both Olero, Inc. (Olero) and EMB (*id.* ¶ 4). (Dkt. 307 at 4). Defendants also argue that both Stepan and Dmytro's claims that Olero and EMB operated out of the same location (dkts. 300-2 ¶¶ 13–14; 300-3 ¶¶ 16–17) are misrepresentations unsupported by any evidence beyond Stepan and Dmytro's declarations. (Dkt. 307 at 4). None of these challenges is persuasive.

It is, of course, true that "parties cannot thwart the purposes of Rule 56 by creating 'sham' issues of fact with affidavits that contradict their prior depositions." *Bank of Ill.* v. *Allied Signal Safety Restraint Sys.*, 75 F.3d 1162, 1168 (7th Cir. 1996). But Stepan did not, as defendants claim, testify at deposition that he had "never talked with, met with, or discussed work with Minochkin." (Dkt. 307 at 4). Rather, at deposition, defendants' attorneys simply never asked Stepan whether he had met or spoken with Minochkin. (Dkt. 260-10). In fact, Minochkin was *never* brought up. (*Id.*). The same is essentially true of Stepan's testimony regarding EMB. Only once did defendants' attorneys mention EMB at Stepan's deposition, and that was to ask Stepan whether "Bruger, Inc. existed long before [Stepan's] relationship with EMB and Olero."

(*Id.* at 39:4–6). To be sure, at deposition Stepan was asked extensively about his interview with Romanyuk (*id.* at 78:8–102:3), but Stepan had difficulty remembering all the details of the interview, which had taken place more than five years earlier, and defendants' attorneys never asked him anything specific about EMB or Minochkin that might have helped jog his memory; nor did they otherwise indicate that defendants were seeking information about EMB or Minochkin. In this context, Stepan's later declaration merely adds information that was never probed at deposition.

Finally, it is simply not true that Stepan and Dmytro's assertions that Olero and EMB operated out of the same location (dkts. 300-2 ¶¶ 13–14; 300-3 ¶¶ 16–17) are unsupported beyond their declarations. That EMB and Olero operated out of the same location also finds support in the deposition testimony of Halyna Kovalchuk, who testified that she worked in human resources for both Olero and EMB and that she always worked out of the same location on Bryn Mawr Avenue. (Dkt. 260-7 at 12:14–24, 31:8–14). For the foregoing reasons, defendants' motions to strike Stepan and Dmytro's declarations are denied.

## II.     *Sergey Karichev's Declaration*

Defendants argue that the declaration of witness Sergey Karichev must be stricken because Karichev was never properly disclosed as a potential witness under Federal Rule of Civil Procedure 26(a)(1). (Dkt. 307 at 5–6). Under that rule, unless "otherwise stipulated or ordered by the court, a party must, without awaiting a discovery request, provide to the other parties … the name … of each individual likely to have discoverable information[.]" Fed. R. Civ. P. 26(a)(1)(A)(i). Defendants are correct that plaintiffs did not disclose Karichev as a witness in their initial disclosures (dkt. 245-1), and there is no indication in the docket that plaintiffs made any supplemental Rule 26(e) disclosures or that Karichev would have "otherwise been made

3

known" to defendants.[1] Fed. R. Civ. P. 26(e)(1)(A) (requiring parties to "supplement or correct" prior disclosures or responses "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing"). Where "a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion … unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). The court need not decide in this case, however, whether plaintiffs' "failure was substantially justified or is harmless[,]" *id.*, because no facts necessary to resolve defendants' motion for summary judgment are supported solely by the Karichev declaration.

## III.     *Plaintiffs' Rule 56.1 Statement of Facts*

As for plaintiffs' Rule 56.1 statement of facts, defendants argue that plaintiffs' statement at times improperly sets out new facts, which should be presented through a Local Rule 56.1(b)(3)(C) submission, and at times fails to provide specific evidentiary cites, instead providing only broad citations to deposition transcripts or affidavits. (Dkt. 307 at 7.) The court has carefully considered all the responses in plaintiffs' Rule 56.1 statement. While the court admonishes plaintiffs for having sporadically failed to follow the local rules, the court denies defendants' motion to strike plaintiffs' Rule 56.1 statement in its entirety, which would be strong medicine to cure plaintiffs' sporadic violations of the local rules. *See Stevo* v. *Frasor*, 662 F.3d 880, 887 (7th Cir. 2011) (rejecting argument that "litigants are entitled to expect strict enforcement [of Local Rule 56.1] by district judges[,]" for "'the decision whether to apply the rule strictly or to overlook any transgression is one left to the district court's discretion'")

---

[1] Fact discovery closed on August 2, 2022 (dkts. 237, 238), but Karichev did not sign his declaration until July 6, 2023 (dkt. 300-4 at 6).

(quoting *Little* v. *Cox's Supermarkets*, 71 F.3d 637, 641 (7th Cir. 1995)). That said, to the extent that plaintiffs' responses provide new facts, rather than facts that support plaintiffs' disputes with defendants' Rule 56.1 statement, the court will not consider those new facts in ruling on defendants' motion for summary judgment. *See Bordelon* v. *Chi. Sch. Reform Bd. of Trs.*, 233 F.3d 524, 529 (7th Cir. 2000) ("Under [the local] rules, the district court is entitled to limit its analysis of the facts on summary judgment to evidence that is properly identified and supported in the parties' statements.").

## BACKGROUND[2]

Brothers Stepan and Dmytro are truck drivers who worked for defendants and bring this putative class action individually and on behalf similarly situated truck drivers.[3] (Dkt. 13 ¶¶ 1, 57, 121). Broadly speaking, the suit alleges that defendants underpaid the Brugers and misclassified them as independent contractors rather than employees. (*Id.* ¶ 1). Based on those core allegations, the Brugers' amended (and operative) complaint (dkt. 13) brought claims under the Illinois Wage Payment and Collection Act (IWPCA), 820 Ill. Comp. Stat. 115 *et seq*, and numerous Illinois common law theories. Defendants moved to dismiss for failure to state a claim (dkt. 14), and this court granted that motion in part, dismissing all but three counts. *Bruger* v. *Olero, Inc.*, 434 F. Supp. 3d 647 (N.D. Ill. 2020). The parties proceeded to discovery, and defendants EMB and Minochkin now seek summary judgment on the remaining counts: (1)

---

[2] The facts in this section are based on the factual assertions and objections thereto contained in the parties' Local Rule 56.1 statements and attendant exhibits, *see* N.D. Ill. R. 56.1(a)(2), (b)(2)–(3), and are construed in the light most favorable to the nonmovant. In accordance with its regular practice, the court has considered the parties' objections to the statements of fact and includes in this background section only those portions of the statements and responses that are appropriately supported and relevant to the resolution of this motion.

[3] Originally filed in the Circuit Court of Cook County in June 2018 (dkt. 13 ¶ 26), the case was later removed to federal court (dkt. 1). This court previously determined that it has jurisdiction under 28 U.S.C. § 1332(d). *Bruger* v. *Olero, Inc.*, 434 F. Supp. 3d 647, 649 n.1 (N.D. Ill. 2020).

unjust enrichment; (2) conspiracy to violate the IWPCA; and (3) violations of the IWPCA.[4] (Dkt. 258).

Defendant Minochkin is the sole owner, officer, and executive of defendant EMB, a trucking company that was incorporated in Illinois in July 2008. (DSOF ¶¶ 1, 3.)[5] Defendant trucking company Olero was incorporated in Illinois in January 2009 and was owned by defendant Romanyuk until it was involuntarily dissolved on June 11, 2021. (*Id.* ¶ 4.) Olero's offices and trucking yard were located on Bryn Mawr Avenue in Chicago. (*Id.* ¶ 5.) Defendants assert that EMB's offices were located at a different address in Lake Forest (*id.* ¶ 2; dkt. 260-3 at 9:22–10:4), but plaintiffs dispute this, contending that EMB operated, to a substantial degree, out of the same location as Olero. (PSOF ¶¶ 2, 70, 88; dkt. 260-7 at 12:14–24, 31:8–14.) Both Olero and EMB had been granted carrier authority and possessed separate and unique Motor Carrier (MC) and United States Department of Transportation (DOT) numbers. (Dkts. 260-5, 260-15.)

Stepan immigrated to the United States from Ukraine in 2015. (DSOF ¶ 20.) Stepan incorporated his own company, Bruger, Inc., (Bruger) in Illinois shortly after he arrived in the United States.[6] (DSOF ¶ 23.) When Stepan found work at a window-installation company and a heating company, those companies paid him through Bruger. (DSOF ¶ 24; dkt. 260-10 at 38:22–

---

[4] A default judgment was entered against defendants Olero, Inc. and Oleg Romanyuk in June 2021. (Dkt. 147). In September 2022, Dmytro Bruger moved to vacate that judgment (dkt. 241), and this court granted that motion (dkt. 243). Neither Olero, Inc. nor Oleg Romanyuk has appeared since.

[5] This decision cites defendants' LR 56.1(a)(2) statement of facts (dkt. 260) as "DSOF" and plaintiffs' LR 56.1(b)(2) response (dkt. 299-1) as "PSOF." Paragraphs 1–61 in plaintiffs' response correspond exactly to the paragraphs of the same number in defendants' LR 56.1 statement. But plaintiffs appear to have accidentally numbered their response to DSOF ¶ 61 as paragraph 62. Thereafter, the numbering in the two briefs is off by one—PSOF ¶ 63 corresponds to DSOF ¶ 62, and so on.

[6] The record provides two competing explanations for why Stepan founded Bruger. In his deposition, Stepan explains that he created Bruger due to his impression that American companies prefer to pay salaries to corporations. (Dkt. 260 at 38:2–7.) But in plaintiffs' Rule 56.1 response, plaintiffs explain that Stepan organized Bruger "only because the trucking company he was working for required him to be 'incorporated' as an entity[.]" (PSOF ¶ 23.)

39:3.) In 2016, Stepan earned his commercial driver's license (CDL) and soon went to work as a driver for an Illinois trucking company, Spectrum Express. (DSOF ¶¶ 22–23.) Spectrum Express required that Stepan be paid through Bruger. (PSOF ¶¶ 22–23; dkt. 260-10 at 37:11–18.)

Like his brother Stepan, Dmytro immigrated to the United States from Ukraine and ultimately landed in Illinois after spending some time in New York and Michigan. (DSOF ¶ 29; dkt. 260-12 at 7:16–9:11, 27:11–23.) Dmytro earned his CDL and sought work as a truck driver. (Dkt. 260-12 at 29:2–11.) When Dmytro also applied to work as a driver for Spectrum Express, he was told that he could work for the company only through his own corporate entity, and not as an individual. (DSOF ¶¶ 31–33; PSOF ¶¶ 31–33; dkt. 260-12 at 30:19–31:16, 35:1–5, 36:17–37:15.) Dmytro then incorporated American Mainstream, Inc. (American Mainstream) in Illinois in October 2016. (DSOF ¶¶ 31–32.)

In the fall of 2016, Olero published a newspaper advertisement stating that Olero was seeking drivers. (DSOF ¶ 38.) Stepan called the number listed in the advertisement and spoke with Olero Human Resources and Safety officer Halyna Kovalchuk (Kovalchuk), who hired drivers for both Olero and EMB. (DSOF ¶¶ 15, 39; PSOF ¶ 15; dkt. 260-7 at 7:1–10, 12:2–4, 14:20.) In November 2016, Stepan went to Olero's office for an interview. (DSOF ¶ 40.) Stepan met with Romanyuk and several managers and completed an "Application for Commercial Drivers," putting his own name, Stepan Bruger, down on the application. (PSOF ¶ 40; DSOF ¶ 41; dkt. 260-14.) At the interview, Romanyuk explained to Stepan that, if he were hired, he would be working full-time and exclusively for both Olero and EMB; he would not be allowed to make any deliveries for other companies, and he would be required to take any delivery routes that he was assigned. (PSOF ¶¶ 55–57; dkt. 300-2 ¶ 4.) Kovalchuk and Romanyuk told Stepan that, in order to work as a commercial driver for Olero, Stepan would have to enter into an

7

agreement as Bruger, his corporate entity, and not as an individual. (Dkt. 300-2 ¶ 11.) Shortly thereafter, on November 7, 2016, Stepan and Romanyuk signed an "Independent Contractor Agreement" between Bruger and Olero. (DSOF ¶¶ 43–46; dkt. 260-15.) By the terms of that agreement, Bruger, operating under Olero's MC and DOT authority, would provide Olero with trucking services at a rate of 50 cents per mile. (DSOF ¶¶ 43, 48; dkt. 260-15.) At no time relevant to this litigation did Bruger possess its own MC/DOT number, own any trucks, or employ any drivers. (PSOF ¶¶ 25–28; dkt. 260-10 at 66:5–16; dkt. 300-2 ¶ 10.) Rather, while working for Olero, Stepan always operated under Olero's MC and DOT authority and used Olero-owned trucks, which he did not lease from Olero. (PSOF ¶¶ 48–49; dkt. 300-2 ¶¶ 8–10.) Bruger was always paid by Olero and stopped providing trucking services to Olero at the end of August 2017. (DSOF ¶¶ 47, 58.)

A few months after Stepan began to work for Olero, Dmytro also contacted Olero about work as a commercial driver. (DSOF ¶ 59; dkt. 300-3 ¶ 3.) In early February 2017, Dmytro had an interview with, among others, Romanyuk, Minochkin, and Kovalchuk. (DSOF ¶ 61; PSOF ¶ 61; dkt. 260-12 at 19:1–21:18; dkt. 300-3 ¶ 4.) Like Stepan, Dmytro was told by both Romanyuk and Kovalchuk that he would not be allowed to work for Olero as an individual but would need his own company to enter into an agreement. (DSOF ¶¶ 60, 72; dkt. 260-12 at 72:21–22; dkt. 300-3 ¶ 14.) That same day, Dmytro and Minochkin signed an "Independent Contractor Agreement" between American Mainstream and EMB. (DSOF ¶¶ 62–63; dkt. 260-5.) By the terms of that agreement, American Mainstream, operating under EMB's MC and DOT authority, would provide EMB with trucking services at a rate of 50 cents per mile. (DSOF ¶ 62; dkt. 260-5.) Dmytro and American Mainstream provided trucking services to both Olero and EMB. (PSOF ¶¶ 74–75, 78–83; dkt. 300-3 ¶11.) Although the agreement indicated that American

Mainstream would be responsible for providing the necessary equipment—a truck tractor and trailer— Romanyuk told Dmytro that a truck would be provided, and Dmytro always drove a truck that was provided by either EMB or Olero (which neither he nor American Mainstream had leased).[7] (DSOF ¶ 65; PSOF ¶¶ 66, 95, 106; dkt. 300-3 ¶¶ 5, 11–12, 18.) At no time relevant to this litigation did American Mainstream possess its own MC or DOT authority, own any trucks, or employ any drivers. (Dkt. 300-3 ¶ 13.) Although Dmytro and American Mainstream's agreement was with EMB, all payments to American Mainstream were made by Olero, and not EMB, regardless of whether trucking services were provided to Olero or EMB. (DSOF ¶¶ 73–74.) Dmytro was not allowed to work for any trucking companies other than Olero and EMB. (PSOF ¶¶ 101, 104–105; dkt. 300-3 ¶ 6.)

## LEGAL STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Lord* v. *Beahm*, 952 F.3d 902, 903 (7th Cir. 2020) (quoting *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "As to materiality, the substantive law"—in this case Illinois law—"will identify which facts are material." *Id.* (quoting *Anderson*, 477 U.S. at 248).[8] When deciding a motion for summary judgment, the court views all facts and

---

[7] Defendants dispute this, claiming that EMB did not, in fact, provide or lease any equipment to either American Mainstream or Dmytro. (DSOF ¶¶ 69, 95; dkt. 260-26 ¶ 22.)

[8] *See, e.g.*, *Gacek* v. *Am. Airlines, Inc.*, 614 F.3d 298, 303 (7th Cir. 2010) (applying Illinois law to retaliatory discharge claim: where claim "governed by Illinois law is litigated in a federal court, the federal court must apply the standard of the state law to a motion for summary judgment"); *Scherer* v. *Rockwell Int'l Corp.*, 975 F.2d 356, 360–61 (7th Cir. 1992) (applying Illinois contract law to determine material elements at summary judgment).

draws all reasonable inferences in the light most favorable to the nonmovant. *Parker* v. *Four Seasons Hotels, Ltd.*, 845 F.3d 807, 812 (7th Cir. 2017) (citing *Anderson*, 477 U.S. at 255).

<u>ANALYSIS</u>

**I.** ***Unjust Enrichment & Conspiracy to Violate Illinois Wage Payment and Collection Act.***

To succeed on a theory of unjust enrichment, Illinois law requires that a plaintiff prove "that the defendant has unjustly retained a benefit to the plaintiff's detriment, and that defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience." *HPI Health Care Servs., Inc.* v. *Mt. Vernon Hosp., Inc.*, 545 N.E.2d 672, 679 (Ill. 1989). "When two parties' relationship is governed by contract," however, neither party may "bring a claim of unjust enrichment unless the claim falls outside the contract." *Util. Audit, Inc.* v. *Horace Mann Serv. Corp.*, 383 F.3d 683, 688–89 (7th Cir. 2004) (citing *Cromeens, Holloman, Sibert, Inc.* v. *AB Volvo*, 349 F.3d 376, 397 (7th Cir. 2003), and *Gen. Agents Ins. Co. of Am., Inc.* v. *Midwest Sporting Goods Co.*, 812 N.E.2d 620, 626 (Ill. App. Ct. 2004), *rev'd on other grounds*, 828 N.E.2d 1092 (Ill. 2005)).

A "civil conspiracy theory has the effect of extending liability for a tortious act beyond the active tortfeasor to individuals who have not acted but have only planned, assisted, or encouraged the act." *McClure* v. *Owens Corning Fiberglass Corp.*, 720 N.E.2d 242, 258 (Ill. 1999) (citing *Adcock* v. *Brakegate, Ltd.*, 645 N.E.2d 888, 893–95 (Ill. 1994)). Illinois law defines a civil conspiracy as "a combination of two or more persons for the purpose of accomplishing by concerted action either an unlawful purpose or a lawful purpose by unlawful means." *Id.* (quoting *Buckner* v. *Atl. Plant Maint., Inc.*, 694 N.E.2d 565, 571 (Ill. 1998)). A civil conspiracy thus requires "an agreement and a tortious act committed in furtherance of that agreement." *Lewis* v. *Lead Indus. Ass'n*, 178 N.E.3d 1046, 1053 (Ill. 2020) (citing *McClure*, 720 N.E.2d at

10

258). To "prevail on a theory of civil conspiracy, a plaintiff must plead and prove (1) the existence of an agreement between two or more persons (2) to participate in an unlawful act or a lawful act in an unlawful manner, (3) that an overt act was performed by one of the parties pursuant to and in furtherance of a common scheme, and (4) an injury caused by the unlawful overt act." *Id.* at 1053–54. Participation must be knowing and voluntary, *id.* at 1053, and not "[a]ccidental, inadvertent, or negligent …." *McClure*, 720 N.E.2d at 258. "A defendant who understands the general objectives of the conspiratorial scheme, accepts them, and agrees, either explicitly or implicitly to do its part to further those objectives … is liable as a conspirator." *Adcock*, 645 N.E.2d at 894.

As defendants point out, plaintiffs have not come forth with any facts to support either their unjust enrichment or civil conspiracy claims. (Dkts. 258 at 28–29, 307 at 2–3). Nor have plaintiffs responded to defendants' motion for summary judgment on these claims beyond merely asserting that the parties' "understanding of the factual basis for" these claims "differs, and a trial is, therefore, required to establish whether [the claims] ought to be dismissed." (Dkt. 298 at 19). As the Seventh Circuit has often reminded, a "non-moving party waives any arguments that were not raised in its response to the moving party's motion for summary judgment." *Nichols* v. *Mich. City Plant Planning Dep't*, 755 F.3d 594, 600 (7th Cir. 2014) (citing *Laborers' Int'l Union of N. Am.* v. *Caruso*, 197 F.3d 1195, 1197 (7th Cir. 1999)). *See also Hernandez* v. *Cook Cty. Sheriff's Office*, 634 F.3d 906, 913 (7th Cir. 2011) ("It is well established in our precedents that 'skeletal' arguments may be properly treated as waived[.]") (quoting *United States* v. *Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991)). In light of plaintiffs' cursory response to defendants' motion for summary judgment on the unjust enrichment and civil conspiracy claims, as well as plaintiffs' failure to present facts that would tend to support

the substantive elements of those claims, this court considers any possible arguments waived. For these reasons, the court grants defendants EMB and Minochkin summary judgment on plaintiffs' unjust enrichment and civil conspiracy claims.

## II.    *Violations of Illinois Wage Payment and Collection Act*

The IWPCA affords employees "a cause of action for the timely and complete payment of earned wages or final compensation, without retaliation from employers." *Costello* v. *BeavEx, Inc.*, 810 F.3d 1045, 1050 (7th Cir. 2016) (quoting *Byung Moo Soh* v. *Target Mktg. Sys., Inc.*, 817 N.E.2d 1105, 1107 (Ill. App. Ct. 2004)). Under the IWPCA, employers may not take "deductions from employees' wages unless the deductions are … 'made with the express written consent of the employee, given freely at the time the deduction is made.'" *Id.* (quoting 820 Ill. Comp. Stat. 115/9). Furthermore, as relevant here, employers must notify employees of their true rate of pay, 820 Ill. Comp. Stat. 115/10, and both wages and final compensation must be paid to employees in a timely manner. *Id.* 115/3–5.

An employee must have "a valid contract or employment agreement" in order to bring a claim seeking to enforce these IWPCA protections. *Hess* v. *Kanoski & Assocs.*, 668 F.3d 446, 452 (7th Cir. 2012). *See also* 820 Ill. Comp. Stat. 115/2 (defining "'wages' … as any compensation owed an employee by an employer pursuant to an *employment contract or agreement between the 2 parties*") (emphasis added). But Illinois courts have made clear that an employment agreement under the IWPCA is "broader than a contract and requires only a manifestation of mutual assent" and not "the formalities and accompanying legal protections of a contract." *Zabinsky* v. *Gelber Grp., Inc.*, 807 N.E.2d 666, 671 (Ill. App. Ct. 2004) (citing Black's Law Dictionary 35 (abridged 5th ed. 1983) and Restatement (Second) of Contracts § 3, Comment *a*, at 13 (1981)). Nor is a verbal manifestation of assent required; rather, "employers

and employees can manifest their assent to conditions of employment by conduct alone." *Landers-Scelfo* v. *Corp. Office Sys., Inc.*, 827 N.E.2d 1051, 1059 (Ill. App. Ct. 2005).

Where, as here, the parties dispute whether the worker is an employee covered by the IWPCA or an independent contractor to whom the IWPCA's protections do not extend, the IWPCA's definition of an "employee" takes center stage. That definition uses a conjunctive, "three-prong test commonly referred to as an ABC test[]" to determine whether an "individual must be classified as an employee for purposes of the IWPCA." *Costello*, 810 F.3d at 1050 (citing 820 Ill. Comp. Stat. 115/2 and *Novakovic* v. *Samutin*, 820 N.E.2d 967, 973 (Ill. App. Ct. 2004)). For an individual to be considered an independent contractor, rather than an employee, all three prongs must be met. *See Novakovic*, 820 N.E.2d at 973–74 (citing 56 Ill. Adm. Code § 300.460(a) (2004)). Under the IWPCA, the term "employee" does not include any individual

> (1) who has been and will continue to be free from control and direction over the performance of his work, both under his contract of service with his employer and in fact; and

> (2) who performs work which is either outside the usual course of business or is performed outside all of the places of business of the employer unless the employer is in the business of contracting with third parties for the placement of employees; and

> (3) who is in an independently established trade, occupation, profession or business.

820 Ill. Comp. Stat. 115/2. For defendants here to succeed on their motion for summary judgment, there must be no genuine dispute with respect to any of these prongs. *See Costello*, 810 F.3d at 1059 ("Under the IWPCA, all individuals are considered to be employees of an employer, unless the employer can prove *all three* prongs of the independent-contractor exemption.") (emphasis in original).

A.    *Stepan Bruger*

No party disputes that Stepan entered into a written agreement with Olero on behalf of Bruger. (PSOF ¶¶ 43–46, 48; dkt. 260-15.) But no written agreement exists between Stepan or Bruger and EMB or Minochkin. The question is, therefore, whether there was ever a "manifestation of mutual assent[,]" *Zabinsky*, 807 N.E.2d at 671, either by words or conduct, *see Landers-Scelfo*, 827 N.E.2d at 1059, between Stepan and EMB or Minochkin.

Plaintiffs have not made any argument that there was any such manifestation of mutual assent between Stepan or Bruger and EMB or Minochkin, and defendants are correct that no such manifestation of mutual assent exists. (Dkt. 258 at 12–14). Although Olero owner Romanyuk told Stepan that, if he were hired, he would be working for both Olero and EMB (PSOF ¶¶ 55-57; dkt. 300-2 ¶ 4), there is no evidence that any representative of EMB ever came to any oral agreement with Stepan. Nor is there any conduct on the part of either Stepan or EMB or Minochkin that speaks to mutual assent between Stepan and EMB or Minochkin. To be sure, as plaintiffs point out, Stepan "at times … hauled loads for EMB[,]" but "[m]ost of the time, [Stepan] hauled loads" for Olero. (Dkt. 300-2 ¶ 35.) Stepan responded to an Olero advertisement, spoke with Olero Human Resources officer Kovalchuk, interviewed solely with Olero representatives, applied for a job with Olero, and came to a written agreement with Olero. (DSOF ¶¶ 15, 38–41, 43–46; dkt. 260-7 at 7:1–10, 12:2–4, 14:20.) Olero "provided all work assignments" to Stepan and "set the prices charged for all deliveries." (Dkt. 300-2 ¶¶ 16–17.) Operating under Olero's carrier authority, Stepan drove a truck provided by Olero that bore Olero's logo. (PSOF ¶¶ 48–49; dkt. 300-2 ¶¶ 8–9, 15.) Stepan would pick the truck up at Olero's

yard and bring it to that same yard for repairs and maintenance.[9] (Dkt. 300-2 ¶ 14.) For any loads that he carried, either for Olero or EMB, Stepan was always paid by Olero. (PSOF ¶ 58.) In short, although Stepan may have carried a few loads for EMB, there are no facts indicating that he did so pursuant to an agreement with EMB or Minochkin, rather than through his contract with Olero. And, again, plaintiffs have not made any argument to that effect. For the purposes of defendants' motion for summary judgment, there is no genuine dispute on this point: the requisite manifestation of mutual assent is wanting with respect to Stepan, EMB, and Minochkin.

Despite the absence of an employment agreement between Stepan, on the one hand, and EMB or Minochkin, on the other, Stepan contends that he can still hold EMB and Minochkin to account under the IWPCA through a theory of joint employer liability. (Dkt. 298 at 10–15). In advancing this argument, Stepan relies almost exclusively on cases that involve statutes other than the IWPCA. (*Id.*). *See Whitaker* v. *Milwaukee Cty., Wis.*, 772 F.3d 802 (7th Cir. 2014) (Americans with Disabilities Act); *Moldenhauer* v. *Tazewell-Pekin Consol. Commc'ns Ctr.*, 536 F.3d 640 (7th Cir. 2008) (Family and Medical Leave Act); *Karr* v. *Strong Detective Agency, Inc.*, 787 F.2d 1205 (7th Cir. 1986) (Fair Labor Standards Act); *Seo* v. *H Mart Inc.*, No. 19 C 3248, 2021 WL 5493238 (N.D. Ill. Nov. 23, 2021) (same). There is certainly nothing improper in arguing by analogy to similar statutes, but plaintiffs seem to ignore that, in this case, there is Illinois precedent expressly defeating these analogies. *See Andrews* v. *Kowa Printing Corp.*, 838 N.E.2d 894, 902–03 (Ill. 2005) (rejecting joint employer liability theory under IWPCA based on standards established by United States Department of Labor for Fair Labor Standards Act).

---

[9] While EMB may have shared its yard with Olero (PSOF ¶¶ 2, 70, 88; dkt. 260-7 at 12:14–24, 31:8–14), that the two companies shared that space does not suggest that Stepan or EMB manifested mutual assent to an agreement simply because Stepan retrieved and returned Olero equipment there.

In *Andrews*, the Illinois Supreme Court stated that the "standard for determining if joint employment exists" under the IWPCA is whether "'two or more employers exert significant control over the same employees—where from the evidence it can be shown that they share or co-determine those matters governing essential terms and conditions of employment.'" 838 N.E.2d at 904 (quoting *Vill. of Winfield* v. *Ill. State Labor Relations Bd.*, 678 N.E.2d 1041, 1044 (Ill. 1997)). "Relevant factors to consider include 'the putative joint employer's role in hiring and firing; promotions and demotions; setting wages, work hours, and other terms and conditions of employment; discipline; and actual day-to-day supervision and direction of employees on the job.'" *Id.* (quoting *Vill. of Winfield*, 678 N.E.2d at 1044). Here, there are facts speaking to all factors except "discipline" and "promotions and demotions."

### Hiring & Firing

Stepan stopped providing trucking services of his own accord (DSOF ¶ 47), but his hiring was almost entirely handled by Olero and Romanyuk: Stepan responded to an advertisement placed by Olero (*id.* ¶ 38), interviewed primarily with Romanyuk (*id.* ¶ 40; PSOF ¶ 40), filled out an application to work for "Olero, Inc." (DSOF ¶ 41; dkt. 260-14), and signed an agreement between Bruger and Olero (DSOF ¶¶ 43–46; dkt. 260-15). On the other hand, the interview process involved Kovalchuk, who hired drivers for both Olero and EMB (DSOF ¶¶ 15, 39; PSOF ¶ 15; dkt. 260-7 at 7:1–10, 12:2–4, 14:20), and took place at Olero's Bryn Mawr Avenue offices, which plaintiffs contend were also used by EMB (PSOF ¶¶ 2, 40, 70, 88; dkt. 260-7 at 12:14–24, 31:8–14).

### Setting Wages, Work Hours, and Other Terms & Conditions of Employment

Stepan claims that he learned from Kovalchuk that both Romanyuk and Minochkin jointly determined how many cents per mile to offer Stepan as compensation. (Dkt. 300-2 ¶ 6.)

16

Beyond that, however, there are no facts implicating EMB or Minochkin in setting Stepan's work hours or other terms and conditions of employment. To the contrary, Romanyuk alone explained to Stepan that, if he were hired, he would be working full-time and exclusively for both Olero and EMB, that he would not be allowed to make any deliveries for other companies, and that he would be required to take any delivery routes that he was assigned. (PSOF ¶¶ 55–57; dkt. 300-2 ¶ 4.) And it was Romanyuk and Kovalchuk who told Stepan that he would have to enter into an agreement as Bruger, Inc., and not as an individual. (Dkt. 300-2 ¶ 11.)

### *Actual Day-to-Day Supervision & Direction*

Although Stepan makes broad, conclusory statements indicating that EMB or Minochkin exercised control over him on a day-to-day basis (*see, e.g.*, dkt. 300-2 ¶ 35 ("I was managed by and reported to Romanyuk, Minochkin and Kovalchuk")), all facts indicate that Olero, and not EMB, supervised and directed Stepan's day-to-day work. According to Stepan's own declaration, Romanyuk and Kovalchuk conducted Stepan's orientation at Olero's offices. (Dkt. 300-2 ¶ 12.) Stepan picked up his truck at Olero's yard and returned it to that same yard for repairs and maintenance. (*Id.* ¶ 14.) Stepan dropped off paperwork at Olero's offices. (*Id.*) Stepan always operated under Olero's MC and DOT authority, used only Olero-owned trucks that bore Olero's logo, and was paid exclusively by Olero (through Bruger). (PSOF ¶¶ 48–49; DSOF ¶ 58; dkt. 300-2 ¶¶ 8–10, 15.) Olero "provided all work assignments" and "set the prices charged for all deliveries." (Dkt. 300-2 ¶¶ 16–17.) And Stepan was required "to report to Olero's dispatch and notify them of where [he] was at certain points in [his] deliveries" and "to comply with [Olero's] policies." (*Id.* ¶¶ 19, 21.) The only fact indicating any interaction between Stepan and EMB is Stepan's assertion that he "communicated with Romanyuk mostly, but also with Minochkin on occasion." (*Id.* ¶ 28.)

Without facts speaking to the nature of the communications between Stepan and Minochkin, Stepan's assertion that he occasionally communicated with Minochkin and his conclusional assertions that Minochkin managed and controlled him cannot, as a matter of law, create a genuine dispute of fact as to whether EMB or Minochkin directed or supervised Stepan in his day-to-day activities. In other words, these spare facts and conclusional assertions cannot create a triable issue of fact that EMB or Minochkin "exert[ed] significant control" over Stepan or "co-determine[d]" with Olero and Romanyuk "those matters governing essential terms and conditions of [Stepan's] employment." *See Andrews*, 838 N.E.2d at 904. Because there is no genuine dispute of fact that EMB or Minochkin came to an employment agreement with Stepan or that EMB or Minochkin acted as Stepan's joint employer, defendants' motion for summary judgment on plaintiffs' IWPCA claim is granted with respect to Stepan Bruger.

## B.    *Dmytro Bruger*

There is no dispute that Dmytro entered into a written agreement with EMB on behalf of American Mainstream (DSOF ¶¶ 62–63; dkt. 260-5) and can therefore bring a claim against EMB and Minochkin under the IWPCA. *See Hess*, 668 F.3d at 452.

Turning to the question of whether the IWPCA considers Dmytro an employee or an independent contractor, although defendants argue that they satisfy all three prongs of the ABC test, (dkt. 258 at 15–19), this court need address only the first prong, for defendants have not met their burden to show that there is no genuine dispute of material fact with respect to that prong. *See* Fed. R. Civ. P. 56(a).[10]

---

[10] Defendants misapprehend their burden at this stage of the litigation, arguing that plaintiffs "cannot prove the elements necessary to be considered an 'employee' for purposes" of the IWPCA. (Dkt. 258 at 14–15). Both as a matter of procedure under Federal Rule of Procedure 56(a) and as a matter of substance under Illinois law, the burden of proof is on defendants. *See* Fed. R. Civ. P. 56(a) ("The court shall grant summary judgment if the *movant* shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.") (emphasis added); *Costello*, 810 F.3d at 1059

With respect to this prong, which probes "an individual's and his employer's relative control over the performance of his work, the [Illinois] Administrative Code defines 'control' as 'the existence of general control or right to general control, even though the details of work are left to an individual's judgment.'" *Novakovic*, 820 N.E.2d at 974 (quoting 56 Ill. Adm. Code § 300.460(a)(1) (2004)).

> Control and direction are indicated when the employer issues assignments and sets quotas, schedules work and imposes time requirements, has the right to change the methods the worker uses in performing his services, requires the individual to follow a routine or schedule, requires the worker to report to a specific location at regular intervals, requires the worker to furnish a record of his time, engages the worker on a permanent basis, reimburses the worker for expenses incurred, provides pensions, bonuses, and sick pay, reports the worker's income to the Internal Revenue Service and deducts taxes, does not allow the worker to engage in other employment, restricts the worker in choice of customers, limits the territory where the worker performs, has the right to discharge, and requires attendance at meetings and training sessions.

*Id.* (citing Ill. Adm. Code §§ 2732.200(g)(1)–(25) (1991)).

Here, the facts evince, at the very least, a genuine dispute regarding Dmytro's employment relationship with EMB and Minochkin. According to Dmytro, while working as a commercial driver under his contract with EMB,[11] Dmytro always drove a truck that EMB or

---

(explaining that the IWPCA presumes that a worker is an employee "unless the *employer can prove*" that the "independent-contractor exemption" applies) (emphasis added).

[11] As this court has previously observed, that the agreement between American Mainstream and EMB—signed by Dmytro and Minochkin, respectively—was labeled an "Independent Contractor Agreement" is of little moment. *See Bruger*, 434 F. Supp. 3d at 653–55. *See also* Ill. Adm. Code § 300.460(c) ("In determining whether [the independent contractor] exemption applies, … designations and terminology used by the parties are not controlling."). Nor does it "significantly alter[] the analysis" that Dmytro entered into his agreement with EMB and Minochkin via American Mainstream, his incorporated entity. *See Ware* v. *Indus. Comm'n*, 743 N.E.2d 579, 586 (Ill. App. Ct. 2000). Indeed, where, as here, an employer *requires* that a job applicant enter into a work agreement through a separate corporate entity, and not as an individual (DSOF ¶¶ 60, 73; dkt. 260-12 at 72:21–22), the fact that the formal parties to the agreement are corporations cannot factor significantly into the employee-contractor analysis. In other words, for purposes of the IWPCA, this court may look beyond forms to facts and view the "Independent Contractor Agreement" between American Mainstream and EMB as simply an agreement between *Dmytro* and EMB.

Olero provided (not leased) to him. (PSOF ¶¶ 95, 106; dkt. 300-3 ¶¶ 5, 11–12, 18.) The trucks were owned by or registered to EMB and operated under EMB's carrier authority. (Dkt. 300-3 ¶ 11.) There are other indicators that Dmytro was an employee, and not an independent contractor. For example, EMB or Olero dispatchers provided all of Dmytro's work assignments (dkt. 300-3 ¶ 19), *see* Ill. Adm. Code §§ 2732.200(g)(1), (17), (20), (23), EMB required Dmytro to meet hauling quotas (dkt. 300-3 ¶25), *id.* § 2732.200(g)(1), and Dmytro could not refuse loads (dkt. 300-3 ¶ 25), *id.* §§ 2732.200(g)(3)–(4), (6), (18), (24), but few indicators are as significant in the trucking context as whether Dmytro used a truck that he or the company provided. *See Mazzei* v. *Rock-N-Around Trucking, Inc.*, 246 F.3d 956, 964 (7th Cir. 2001) (fact that drivers owned their own trucks and were responsible for all maintenance, storage and fuel costs was "a strong indication that the drivers were independent contractors" under common-law test) (quoting *EEOC* v. *N. Knox Sch. Corp.*, 154 F.3d 744, 749 (7th Cir. 1998)). Also significant, in any context, are facts indicating that EMB and Olero would not allow Dmytro to work for other companies or haul loads other than those that EMB and Olero directed him to carry (PSOF ¶¶ 101, 104–05.) *See* Ill. Adm. Code §§ 2732.200(g)(16), (20), (24).

Defendants dispute Dmytro's characterization of the restrictions placed on him (DSOF ¶¶ 100, 103–04; dkt. 260-26) and claim that EMB did not, in fact, provide or lease any equipment to either American Mainstream or Dmytro (DSOF ¶¶ 69, 95; dkt. 260-26 ¶ 22). But at summary judgment, when presented with what are directly opposed assertions of material fact—both accounts provided by affidavit—this court cannot make credibility determinations properly reserved to the trier of fact. *See Anderson*, 477 U.S. at 255 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a

directed verdict."); *Runkel* v. *City of Springfield*, 51 F.4th 736, 741–42 (7th Cir. 2022) (same). While the court need not determine that Dmytro was an employee, the court cannot, in light of these disputes of fact, determine that he was an independent contractor and grant defendants' motion for summary judgment.

The analysis does not end there. Defendants argue that, even if Dmytro is an employee under the IWPCA, the evidence shows that Dmytro was properly paid in accordance with his employment agreement. (Dkt. 258 at 21–28.) According to defendants, Dmytro was always paid the agreed-upon 50 cents per mile, and his employment agreement included consent to all other deductions, including escrow deductions that were returned to him. (*Id.*) There are several problems with defendants' arguments. First, under Section 9 of the IWPCA, "deductions by employers from wages or final compensation are prohibited unless such deductions are (1) required by law; (2) to the benefit of the employee; (3) in response to a valid wage assignment or wage deduction order; [or] (4) made with the express written consent of the employee, *given freely at the time the deduction is made*[.]" 820 Ill. Comp. Stat. 115/9 (emphasis added). While Dmytro may have broadly agreed to some (or all) of the purportedly improper deductions in the written agreement between EMB and American Mainstream, defendants fail to present evidence that Dmytro freely consented in writing to the deductions from his wages *at the time those deductions were made*. Second, there is a larger dispute over the scope and terms of Dmytro's employment agreement. Put another way, Dmytro disputes whether the written employment agreement fully and accurately encompassed all the terms of his agreement with EMB and Minochkin. (*See, e.g.,* Dkt. 300-3 ¶¶ 5–10, 15, 18–20, 24–26, 29, 33–35.) Finally, there is a dispute over mileage calculation, which is not described in the written agreement. (Dkt. 260-5.) Dmytro claims that there is a discrepancy between how mileage was supposed to be calculated

and how it was actually calculated. (Dkt. 300-3 ¶¶ 33–35.) Defendants have not put these issues beyond dispute, and they must, therefore, be decided by a trier of fact. For these reasons, the court denies defendants' motion for summary judgment with respect to Dmytro's IWPCA claim.

### III.  *Individual Liability*

Under the IWPCA, liability "can be imposed upon employers, as that term is traditionally understood, and upon any officers of a corporation or agents of an employer who knowingly permitted the [IWPCA] violation." *Andrews*, 838 N.E.2d at 901; *see also* 820 Ill. Comp. Stat. 115/13) ("In addition to an individual who is deemed to be an employer pursuant to Section 2 of this Act, any officers of a corporation or agents of an employer who knowingly permit such employer to violate the provisions of this Act shall be deemed to be the employers of the employees of the corporation.").

Minochkin argues, essentially, that he never had any interactions with Dmytro, from hiring to day-to-day activities to payment of wages. (Dkt. 258 at 20–21). Minochkin had, he says, "zero interaction" with Dmytro "regarding any work [he] was performing … and never had a conversation" with him. (*Id.* at 20). Minochkin says that he was not involved at all in hiring or supervising Dmytro. (*Id.* at 21). And, Minochkin claims, he did not "have any idea what was being deducted or paid" to Dmytro. (*Id.*). Given that Minochkin interviewed Dmytro (PSOF ¶ 61; dkt. 260-12 at 19:1–21:18; dkt. 300-3 ¶ 4) and signed—as sole owner, officer, and executive of EMB—the agreement between EMB and American Mainstream (DSOF ¶¶ 1, 3, 62–63; dkt. 260-5), Minochkin's claims border on the fantastical. For reasons that should be obvious, the court denies Minochkin's request to be dismissed from the case.

In summary, defendants are entitled to judgment as a matter of law on all of Stepan's claims and on Dymtro's conspiracy and unjust enrichment claims.

## SANCTIONS

Also before the court are two motions for attorneys' fees and other sanctions—one brought under 28 U.S.C. § 1927 (dkt. 269) and the other under Federal Rule of Civil Procedure 11 (dkt. 278)—presented by defendants EMB and Minochkin against plaintiffs and their counsel. For the reasons discussed below, both motions are denied.

## I.    Sanctions Under 28 U.S.C. § 1927

Defendants moved first for sanctions under 28 U.S.C. § 1927. (Dkt. 269.) This statute provides that "Any attorney … who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." *Id.* To prevail on a motion for sanctions under Section 1927, the moving party must make "a showing of either subjective or objective bad faith." *4SEMO.com Inc.* v. *S. Ill. Storm Shelters, Inc.*, 939 F.3d 905, 913 (7th Cir. 2019). Defendants here focus on the latter. "Objective bad faith consists of reckless indifference to the law: 'pursuing a path that a reasonably careful attorney would have known, after appropriate inquiry, to be unsound.'" *Id.* (quoting *Riddle & Assocs., P.C.* v. *Kelly*, 414 F.3d 832, 835 (7th Cir. 2005)) (cleaned up). Put another way, an attorney's conduct may evince objective bad faith when the attorney exhibits a "serious and studied disregard for the orderly process of justice" or advances claims that are "without a plausible legal or factual basis and lacking in justification." *Pac. Dunlop Holdings, Inc.* v. *Barosh*, 22 F.3d 113, 119 (7th Cir. 1994) (quoting *Walter* v. *Fiorenzo*, 840 F.2d 427, 433 (7th Cir. 1988)).

Defendants argue that Section 1927 sanctions are warranted here because, they say, plaintiffs' attorney has repeatedly misrepresented facts to this court and knowingly pursued meritless claims. (Dkt. 269 at 1). According to defendants, after discovery had closed, plaintiffs'

attorney should have known that plaintiffs' claims had "zero evidentiary support." (*Id.* at 3). With "no facts" to support plaintiffs' claims, defendants argue, plaintiffs' attorney should not have continued pursuing this "frivolous lawsuit." (*Id.*).

In light of the preceding analysis with respect to defendants' motion for summary judgment, defendants' assertions regarding the paucity of facts supporting plaintiffs' claims are unpersuasive. As this court's analysis should make clear, discovery did reveal at least some facts tending to support plaintiffs' claims. Certainly Dmytro's IWPCA claim, for which summary judgment is denied, would not have seemed, "after appropriate inquiry" by plaintiffs' counsel, "to be unsound." *See 4SEMO.com Inc.*, 939 F.3d at 913. And while plaintiffs and their counsel could not muster enough facts of substantive significance to demonstrate genuine disputes of material fact with respect to Stepan's IWPCA claim, such failure does not render the pursuit of that claim "frivolous." As for plaintiffs' conspiracy and unjust enrichment claims, for which this court grants summary judgment to defendants, it is true that plaintiffs have not adequately pursued these claims and that there seem to be few, if any, facts supporting them. Nevertheless, the court rejects defendants' broad assertion that "nothing in discovery" shows that EMB or Minochkin "had any discussions with anyone at Olero." (Dkt. 269 at 15). Discovery did reveal disputes regarding the extent to which EMB and Minochkin acted in concert with Olero and Romanyuk—for example, whether the two companies operated out of the same location and whether the terms and conditions of Dmytro's employment were determined jointly by Romanyuk and Minochkin. For these reasons, plaintiffs' pursuit of these claims is not sanctionable under Section 1927.

Regarding the litany of misrepresentations with which defendants have charged plaintiffs' counsel, the court must begin by admonishing defendants' counsel for likewise

misrepresenting facts obtained through discovery[12] and for failing to explain in either their motion for sanctions (dkt. 269) or their Section 1927 reply brief (dkt. 282) how any alleged misrepresentations have vexatiously and unreasonably multiplied the proceedings. The court has cobbled together from defendants' briefing that defendants essentially take issue with how plaintiffs' counsel has represented some of the facts underlying (1) plaintiffs' theory of joint employer liability (dkt. 269 at 3–8) and (2) plaintiffs' belief that Prymor, Inc. (Prymor) is the successor corporation of Olero (*id.* at 8–13). The court is hard pressed to understand how plaintiffs' counsel's theory of joint employer liability is "frivolous." Even setting aside any of plaintiffs' counsel's alleged misrepresentations, there are facts obtained through discovery that do tend to support theories of joint employer liability with respect to both Stepan (against EMB and Minochkin) and Dmytro (against Olero and Romanyuk). The same is true of plaintiffs' counsel's interest in Prymor as Olero's successor. Even if this were not the case, it is not this court's job to construct arguments for parties. On its own review, the court does not perceive the pursuit of these theories as evincing "reckless indifference to the law[,]" *see 4SEMO.com Inc.*, 939 F.3d at 913, and defendants have not helped the court to connect the dots between the alleged misrepresentations and Section 1927's requirement that counsel's conduct vexatiously and unreasonably multiply proceedings. For these reasons, defendants' motion for sanctions under Section 1927 (dkt. 269) is denied.

## II.  Sanctions Under Federal Rule of Civil Procedure 11

Approximately one month after filing their Section 1927 motion, defendants filed a new motion for sanctions under Rule 11. (Dkt. 278.) Federal Rule of Civil Procedure 11(b) "requires

---

[12] For example, as discussed above, defendants' claim that Minochkin had "zero interaction" with Dmytro (dkt. 258 at 20) is clearly contradicted by the facts.

that attorneys certify 'to the best of [their] knowledge, information, and belief, formed after an inquiry reasonable under the circumstances' that their filings have adequate foundation in fact and law and lack an 'improper purpose.'" *Royce* v. *Michael R. Needle P.C.*, 950 F.3d 939, 957 (7th Cir. 2020) (quoting Fed. R. Civ. P. 11(b)). "The rule 'is principally designed to prevent baseless filings.'" *Id.* (quoting *Brunt* v. *Serv. Emps. Int'l Union*, 284 F.3d 715, 721 (7th Cir. 2002)). Improper purposes include "to harass, cause unnecessary delay, or needlessly increase the cost of litigation." Fed. R. Civ. P. 11(b)(1). An attorney should not be sanctioned for presenting "claims, defenses, and other legal contentions" so long as they "are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law[.]" *Id.* 11(b)(2). Similarly, sanctions are inappropriate where "factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery[.]" *Id.* 11(b)(3). *See also McGreal* v. *Vill. of Orland Park*, 928 F.3d 556, 558–59 (7th Cir. 2019). "The test is objective. An attorney cannot avoid sanctions by claiming subjective good faith if a reasonable inquiry into the facts and law would have revealed the frivol[ousness] of the position." *McGreal*, 928 F.3d at 560. *See also Thornton* v. *Wahl*, 787 F.2d 1151, 1154 (7th Cir. 1986) ("Rule 11 requires counsel to study the law before representing its contents to a federal court. An empty head but a pure heart is no defense.").

Defendants argue that plaintiffs and their counsel should be sanctioned under Rule 11 for filing a motion to remand (dkt. 263) this case to state court. (Dkt. 278 at 2). As defendants see it, that motion, which this court denied (dkt. 286), was thoroughly lacking in both evidentiary and legal support. (Dkt. 278 at 4–8). Specifically, defendants believe that sanctions are warranted

because "[n]owhere" in plaintiffs' motion to remand did "they cite or provide any supporting case law or evidence to show why the matter should be remanded."[13] (*Id.* at 2).

The core justifications plaintiffs advanced in their motion to remand were that (1) the amount in controversy ($5,000,000) required under the Class Action Fairness Act (CAFA) was no longer met and (2) diversity of citizenship no longer existed. (Dkt. 263 at 12–15). As this court's order denying that motion makes clear (dkt. 286), those alleged changes to the facts underlying subject-matter jurisdiction are irrelevant, for jurisdiction under CAFA attaches at the time the suit is filed, or—in this case—removed to federal court. *See Cunningham Charter Corp.* v. *Learjet, Inc.*, 592 F.3d 805, 807 (7th Cir. 2010); *Grinnell Mut. Reinsurance Co.* v. *Shierk*, 121 F.3d 1114, 1116 (7th Cir. 1997). To defendants, the clarity of this principle, as discussed in *Cunningham*, means that plaintiffs' motion to remand was frivolous and, therefore, sanctionable. (Dkt. 278 at 8).

Had plaintiffs ignored this principle, or its discussion in *Cunningham*, defendants' argument would be persuasive, but plaintiffs engaged directly with *Cunningham* in their motion to remand (dkt. 263 at 14–15), attempting—albeit unsuccessfully—to distinguish that case based on the several justifications for its holding and its distinctive procedural posture. *See Cunningham Charter Corp.*, 592 F.3d at 806–07 (holding "that federal jurisdiction under the Class Action Fairness Act does not depend on certification," justifying that holding in part because a "federal court's refusal to certify [a] class could [mean] that the case would continue as a class action in state court" and in part because the holding comported with "the general

---

[13] At the threshold, the court rejects this erroneous representation of plaintiffs' motion to remand. (Dkt. 263.) Plaintiffs' motion discussed and attempted to distinguish Seventh Circuit precedent (*id.* at 11–15), and presented facts that, although ultimately not persuasive, spoke to whether this court continued to possess subject-matter jurisdiction (*id.* at 1–11).

principle that jurisdiction once properly invoked is not lost by developments after a suit is filed"). In their motion to remand, plaintiffs argued that *Cunningham* might not apply because the procedural posture in this case differed from that in *Cunningham*, *i.e.*, that this court had not denied class certification. (Dkt. 263 at 14–15.) Although plaintiffs were unsuccessful in their attempt to distinguish *Cunningham*, this court is not inclined to sanction them for that attempt when plaintiffs' arguments were grounded in both *Cunningham*'s alternative justifications and this case's distinct posture. In the words of Rule 11, this court is not prepared to sanction an attorney for making "a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law[.]" Fed. R. Civ. P. 11(b)(2). For these reasons, defendants' motion for sanctions under Rule 11 (dkt. 278) is denied.

## CONCLUSION AND ORDER

Defendants' motion for sanctions under Section 1927 (dkt. 269) is denied. So too is defendants' motion for sanctions under Rule 11 (dkt. 278). Defendants' motion for summary judgment (dkt. 258) is granted in part and denied in part. The motion is granted with respect to plaintiffs' civil conspiracy and unjust enrichment claims. With respect to plaintiffs' Illinois Wage Payment and Collection Act claims, the motion is granted as to plaintiff Stepan Bruger and denied as to plaintiff Dmytro Bruger. This case will be called for status on October 11, 2023, at 9:45 a.m. at which time counsel shall be prepared to report on the possibility of settlement and to set a trial date.

Date: September 27, 2023

_____
U.S. District Judge Joan H. Lefkow